**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| KINDRED HEALTHCARE, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Civil No.: |
| | ) | |
| vs. | ) | |
| | ) | |
| ALEX M. AZAR, II | ) | |
| Secretary, United States Department | ) | |
| of Health and Human Services | ) | |
| 200 Independence Avenue, S.W. | ) | |
| Washington, D.C. 20201, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**COMPLAINT FOR JUDICIAL REVIEW OF**
**FINAL ADVERSE AGENCY ACTION**

Plaintiff, Kindred Healthcare, Inc., by and through its undersigned attorneys, brings this action against Defendant, Alex M. Azar, II, in his official capacity as Secretary of the United States Department of Health and Human Services ("the Secretary") and states as follows:

I.    __Introduction__

1.    Plaintiff brings this action to obtain judicial review of a decision of the Secretary (the "Secretary's Decision"), which arbitrarily reversed a partially favorable Medicare reimbursement decision (the "Board Decision") rendered by the Provider Reimbursement Review Board (the "PRRB" or "Board"), the independent administrative appeals panel charged by statute with resolving Medicare provider reimbursement disputes.

2.    The Board Decision and the Secretary's Decision involved Plaintiff's entitlement to Medicare reimbursement for certain Medicare "bad debts," defined as "amounts considered to be uncollectable" by a health care provider for services furnished to a Medicare beneficiary. Claims for bad debts typically arise when a beneficiary fails to pay his or her deductible and

coinsurance amounts, and the Medicare provider is unable to collect these payments from the beneficiary or other responsible party.  In such cases, the Medicare provider can include any costs attributable to these unpaid and uncollectible deductible and coinsurance amounts in the provider's "cost report," the form submitted by the provider to the Centers for Medicare and Medicaid Services ("CMS") (or one of its contractor intermediaries) to seek reimbursement for services rendered.

3.      In order to claim unpaid deductibles and coinsurance as "uncollectible" bad debt, the Medicare provider must demonstrate, *inter alia*, that it made "reasonable collection efforts" from the beneficiary, or from any third party that may share responsibility for such amounts.

4.      Plaintiff's administrative appeal below challenged the denial of Medicare reimbursement for bad debts attributable to "Dual Eligible" beneficiaries – that is, (typically indigent) beneficiaries enrolled in both the Medicare and Medicaid programs, and whose Medicare deductibles and coinsurance amounts are partially paid for by a state-funded Medicaid program –  who received care at nine of Plaintiff's Long Term Care Hospitals ("LTCHs") in Pennsylvania and Massachusetts, and one skilled nursing facility ("SNF") in Tennessee, between 2006 and 2014.   The Medicare contractor denied these bad debt claims on the theory that Plaintiff had failed to demonstrate reasonable efforts to collect from the responsible state Medicaid programs.

5.      Specifically, the Medicare contractor concluded that Plaintiff's facilities failed to comply with CMS's "must-bill" policy, which requires providers to bill the relevant state Medicaid program for Medicare deductibles and coinsurance amounts of Dual Eligible beneficiaries and to receive a remittance advice ("RA") explicitly denying payment (in whole or in part) before the uncollectible amount can be reimbursed as Medicare bad debt.

2

6.      Although providers are not required to enroll in a state's Medicaid program for purposes of rendering services to Dual Eligible patients, only a Medicaid-enrolled provider can submit claims for reimbursement to that state's Medicaid program and, therefore, only a Medicaid-enrolled provider can receive an RA from the Medicaid program denying payment. During the relevant time period, neither Plaintiff's LTCHs in Pennsylvania and Massachusetts, nor its SNF in Tennessee, were enrolled in their respective state's Medicaid program.  Further, as the PRRB noted, prior to January 1, 2012, the Pennsylvania Medicaid program did not even recognize LTCHs as a facility type eligible for Medicaid enrollment (even though Medicare recognizes LTCHs).

7.      The PRRB reversed the Medicare contractor's decision with respect to bad debt claims for services rendered by the Pennsylvania LTCHs prior to January 1, 2012.  In doing so, the PRRB reasoned that because the Pennsylvania Medicaid program did not recognize LTCHs as a Medicaid-eligible facility type prior to 2012, and because the Pennsylvania LTCHs could not, therefore, enroll in the state's Medicaid program until 2012, Plaintiff should not be required to engage in the futile process of attempting to bill the Pennsylvania Medicaid program and receive an RA.  The PRRB concluded that, with regard to this particular subset of pre-2012 claims, the must-bill policy did not apply to Plaintiff's Pennsylvania LTCHs.

8.      With respect to the remainder of Plaintiff's bad debt claims – that is, those submitted for services rendered by the Tennessee SNF, the Massachusetts LTCHs, and the Pennsylvania LTCHs after January 1, 2012 – the PRRB affirmed the Medicare contractor's decision to deny Plaintiff's claims.  The Board Decision concluded that the Tennessee SNF, the Massachusetts LTCHs, and, on or after January 1, 2012, the Pennsylvania LTCHs could have enrolled in their respective states' Medicaid programs.  Accordingly, the PRRB concluded that

3

the inability of these providers to bill Medicaid and to obtain an RA did not excuse strict compliance with the "must-bill" policy.

9.      The Secretary affirmed the unfavorable portion of the Board Decision and reversed the PRRB's favorable holding, concluding that compliance with the "must-bill" policy is mandatory and that no exceptions can be made.  In so ruling, the Secretary departed from years of federal circuit court decisions rendered on the issue of applying the must-bill policy to providers unable to enroll in their respective state's Medicaid program (such as the Pennsylvania LTCHs).  In fact, such case law served as the basis for the favorable portion of the Board Decision with respect to the Pennsylvania LTCHs.  Still, the Secretary flatly disregarded this Court's holding that it "is not willing to place a stamp of judicial approval on a policy that puts non-participating providers in the position of not being paid due to the delinquency of federally-funded state programs." *Cove Associates Joint Venture d/b/a Life Care Center of Scottsdale v. Sebelius*, 848 F.Supp.2d 13, 28 (2012).  The Secretary's rigid interpretation and enforcement of the must-bill policy to the claims at issue runs counter to any common-sense application of the rule.

10.      What is more, albeit fruitless and futile, the Providers *did* bill their respective states' Medicaid programs for the bad debts at issue in an effort to comply with the must-bill policy.  Despite their best efforts, however, the Providers were unable to force the state Medicaid agencies to provide them with RAs without Medicaid provider numbers.

11.      As Medicare providers not enrolled in Medicaid, these facilities "are caught in a classic Catch-22.  They provide services to dual-eligible patients . . . and then attempt to collect payment for the bad debt incurred as a result of those services.  The [fiscal intermediary] refuses

11938051

to reimburse the facilities without a state-issued RA, and the states refuse to issue the RAs." *Cove*, 848 F.Supp.2d at 28.

12.     The Secretary's decision to apply the must-bill policy where Providers were not enrolled, and in some cases could not be enrolled, as Medicaid providers constitutes an arbitrary and capricious abuse of discretion in violation of the Administrative Procedure Act ("APA"). The Providers did bill their respective states' Medicaid programs and have satisfied the requirements of the must-bill policy to the fullest extent possible, even though the Providers, as non-participants in the Medicaid program, had no mechanism by which to obtain an RA.

13.     The Secretary's decision likewise represents an arbitrary deviation from past enforcement of the must-bill policy.   Indeed, in a brief filed by the Secretary in *Community Hosp. of Monterey Peninsula v. Thompson*, Case No. C-01-0142 (N.D. Cal. Oct. 11, 2001), the Secretary explicitly exempted from the must-bill policy two types of providers that, similar to the Pennsylvania LTCHs, were unable to enroll in many states' Medicaid programs (*i.e.*, community mental health centers ("CMHCs") and institutions for mental diseases ("IMDs")).   Moreover, pursuant to a policy in place from 1995 through 2003, for providers that had not (or could not) enroll in the Medicaid program, the Secretary previously accepted "alternative documentation" in lieu of proof that the provider billed the Medicaid program.

14.     Furthermore, the Secretary himself (through CMS) is responsible for approving each state's Medicaid program and establishing the programs' criteria for operation, including those programs excluding LTCHs from Medicaid enrollment and non-participating providers from billing and obtaining RAs.   The Secretary reviewed and approved the State of Pennsylvania's Medicaid program, including its exclusion of LTCHs as participating providers. Pennsylvania's approved program offers no means for non-participating providers to bill the

state and obtain an RA.   Likewise, the approved assistance programs in Massachusetts and Tennessee offer no mechanism for non-enrolled providers to bill those states and obtain RAs.   In fact, there is no requirement that Medicare participating providers enroll in any particular state's Medicaid program.   *See* 42 C.F.R. Parts 482 and 483.   Thus, for the Secretary to now require the Providers to bill each state's program and produce RAs to support crossover bad debts is illogical, arbitrary, and capricious.

15.     Participation in the Medicaid program is not legally required.   *See Spectrum Health Continuing Care Group v. Anna Marie Bowling Irrecoverable Trust*, 410 F.3d 304, 313 (6th Cir. 2005) ("A health-care provider is not required to participate in the Medicaid program, but rather voluntarily contracts with the state to provide services to Medicaid-eligible patients in return for reimbursement from the state at the specified rates.").   Providers need not enroll in a state Medicaid program as a condition of participation in Medicare.   *See*  42 C.F.R. Parts 482-83. Likewise, there is no legal requirement that a provider must be enrolled in a state Medicaid program to be reimbursed for bad debts.   *See* 42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 413.89.

16.     A bad debt reimbursement scheme whereby a Medicare provider is required to enroll in a state Medicaid program, even when the state Medicaid program does not permit such enrollment, and even when the Medicare program does not require such enrollment as a condition of participation, is fundamentally unfair and inconsistent with the purpose of 42 U.S.C. § 1395x(v)(1)(A), which entitles Medicare providers to reimbursement for the reasonable cost of caring for Medicare beneficiaries.   That providers do not participate in *Medicaid* should not foreclose them from payment of *Medicare* bad debts for dual-eligible patients.   If CMS wishes for providers that do not participate in Medicaid to follow the "must-bill" policy, CMS must first advise state Medicaid agencies that they are required to develop mechanisms for providing RAs

to those providers when asked.  Until then, application of the must-bill policy to those providers is arbitrary and capricious.

17.    Regardless, the must-bill policy is invalid.  Despite the Secretary's position, neither the Social Security Act, the Medicare regulations governing bad debt reimbursement, nor CMS's interpretive guidance on this issue contain any language requiring the Providers to bill Medicaid to collect on debt owed by a Dual Eligible beneficiary.

18.    Likewise, requiring providers who do not participate in their state Medicaid plan to bill and receive RAs from their state plan as proof of reasonable collection efforts represents an invalid change in policy because such a rule was not in effect prior to August 1, 1987.  As such, the must-bill rule violates the "Bad Debt Moratorium," 42 U.S.C. § 1395f (notes section), which prohibits the Secretary from imposing new or different bad debt criteria on a provider after August 1, 1987.  Congress passed the Bad Debt Moratorium to put a stop to the Secretary's inconsistent actions pertaining to bad debt reimbursement, and to prevent the Secretary from forcing providers to change their policies regarding indigency determinations by withholding reimbursement for bad debts.  Because the must-bill rule constitutes a change in policy put in place after the Bad Debt Moratorium had gone into effect, the must-bill policy is invalid, unenforceable, and inapplicable to Plaintiff's claims for bad debt reimbursement.

## II.    Jurisdiction and Venue

19.    This action arises under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, which establishes the Medicare program, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*

20.    This Court has jurisdiction under 42 U.S.C. § 1395oo(f), which grants Medicare providers the right to seek judicial review of a final decision of the PRRB or a final decision of the Secretary affirming, modifying, or reversing the PRRB's decision.

11938051

21.     Venue lies in this judicial district pursuant to 42 U.S.C. § 1395oo(f)(1), which permits actions for judicial review of final decisions by the PRRB to be brought in the United States District Court for the District of Columbia.

## III.    The Parties

22.     Plaintiff, Kindred Healthcare, Inc., is a Louisville, Kentucky-based corporation that owns and operates long-term care facilities nationwide.

23.     During the periods at issue, Plaintiff owned and operated the facilities whose claims for Medicare bad debt reimbursement are at issue here, including nine LTCHs located in Pennsylvania (the "Pennsylvania LTCHs") and Massachusetts (the "Massachusetts LTCHs"), as well as one SNF located in Tennessee (the "Tennessee SNF"). The Pennsylvania LTCHs participated in the Medicare program as providers of services under Medicare Provider Nos. 39-2042, 39-2043, 39-2027, 39-2028, 39-2032, 39-2049, and 39-6110. The Massachusetts LTCHs participated in the Medicare program as providers of services under Medicare Provider Nos. 22-2044 and 22-2045. The Tennessee SNF participated in the Medicare program as a provider of services under Medicare Provider No. 44-5140.

24.     Defendant Alex M. Azar, II is the current Secretary of the Department of Health and Human Services ("HHS"). The Secretary is the federal officer responsible for the administration of the Medicare and Medicaid programs. References to the Secretary herein are meant to refer to him, his subordinate agencies and officials, and his official predecessors or successors as the context requires.

25.     The Secretary has delegated considerable responsibility for the administration of the Medicare and Medicaid programs to CMS, an agency within HHS. Before July 2001, CMS was known as the Health Care Financing Administration ("HCFA"). *See* 66 Fed. Reg. 35,437 (July 5, 2001).

IV.     **Overview of Medicare, Medicaid, and Dual-Eligible Patients.**

26.     Congress enacted both the Medicare program and the Medicaid program in the Social Security Amendments of 1965, Pub. L. No. 89-97, §§ 102(a), 121(a).

27.     The Medicare program is a federally funded program established to provide health insurance for the aged, the disabled, and individuals afflicted with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426-1, 1395 *et seq.*

28.     The Medicaid program is a joint state and federally funded program established to furnish medical assistance under state plans to, among others, families with dependent children and aged, blind, or disabled individuals, "whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396-1.

29.     The Medicare program consists of four main parts.  Part A, at issue here, provides coverage for the costs of hospital services, related post-hospital services, home health, and hospice care. 42 U.S.C. §§ 1395c-1395i-5.  This includes skilled nursing services.  42 U.S.C. § 1395f(a)(2)(B).

30.     LTCHs and SNFs may participate in the Medicare program as "providers" of services by entering into a "provider agreement" with the Secretary.  42 U.S.C. §§ 1395cc, 1395x(u).  During the period at issue here, CMS contracted with private insurance companies to act as "fiscal intermediaries" ("Intermediaries") and assist in the day-to-day operations of the Medicare program.  42 U.S.C. § 1395h.  Intermediaries determine the payment to be made to a provider based on audits of annual cost reports submitted by the provider.  42 C.F.R. § 413.20. Intermediaries are responsible for reviewing the cost report and issuing a Notice of Program Reimbursement ("NPR"), which sets forth the amount of allowable Medicare payments.  42 C.F.R. § 405.1803.

31.     Individuals who qualify for both health insurance benefits under the Medicare program and medical assistance benefits under a state Medicaid plan – a group mostly composed of elderly low-income individuals – are commonly known as "dual eligible" individuals. (Such "dual eligible" individuals are hereinafter referred to in this Complaint as "Dual Eligible Patients.")  In many cases, Dual Eligible Patients cannot afford Medicare Part A deductibles and coinsurance payments.   For this reason, CMS allows states to use Medicaid dollars to pay the cost-sharing obligations of Dual Eligible Patients.  42 U.S.C. § 1396a(a)(10)(E)(i).  Specifically, Medicaid plans provide medical assistance for Medicare cost-sharing for a particular category of Dual Eligible Patients called "Qualified Medicare Beneficiaries" ("QMBs").  *Id.*; *see also* 42 U.S.C. § 1396d(p)(1) & (3).  The amount paid under the state Medicaid plan for a QMB's Medicare coinsurance or deductible may be limited by a payment ceiling, and the state is not required to make any payment when the amount paid under Medicare exceeds the payment amount that would otherwise be paid under the state plan if the service were provided to an individual eligible for Medicaid who is not a QMB. *See* 42 U.S.C. § 1396a(n)(2).  When a provider furnishes covered services to a QMB, the Medicare program serves as the patient's primary payor, while state Medicaid plans serve as the secondary payor.

**V.     Background Regarding Medicare Reasonable Cost Reimbursement and Payment to LTCHs and SNFs.**

32.     Prior to July 1, 1998, the Medicare program paid SNFs and LTCHs for furnishing care to Medicare beneficiaries based on a retrospective determination of the facilities' "reasonable cost," as defined in the Secretary's regulations and identified in a provider's annual cost report. Thereafter, pursuant the Balanced Budget Act of 1997, Congress required the Secretary to implement a prospective payment system under which facilities are reimbursed through prospectively-fixed rates.  42 U.S.C. § 1395yy(e); 42 C.F.R. § 413.300 *et seq.*

10

33.     However, certain other Medicare payments continued to be retrospectively determined and reimbursed on a "reasonable cost" basis, including the unpaid deductible and coinsurance obligations of Medicare beneficiaries at issue here (*i.e.*, "bad debt").  42 C.F.R. § 413.89(a), (h).  The Secretary's regulations define "bad debt" as "amounts considered to be uncollectible from accounts and notes receivable that were created or acquired in providing services."  42 C.F.R. § 413.89(b)(1); *see also* Provider Reimbursement Manual ("PRM") § 302.1.  The regulations further define "accounts receivable" and "notes receivable" as "designations for claims arising from the furnishing of services, and are collectible in money in the relatively near future."  *Id.*

34.     Unpaid patient obligations in general are treated as reductions in revenue rather than reimbursable "costs" of furnishing care. 42 C.F.R. § 413.89(a), (c).  However, because the Medicare statute provides that the Secretary's regulations may not result in the costs of Medicare-covered services being shifted to non-Medicare patients (or their payers), *see* 42 U.S.C. § 1395x(v)(1)(A)(i), the regulations provide for reimbursement of Medicare bad debts so that the costs of Medicare services covered by such amounts are not borne by other patients.  42 C.F.R. § 413.89(d).  This policy is known as the prohibition against cost-shifting or cross-subsidization.

## VI.     **Payment for Medicare Bad Debts Attributable to Dual Eligible Patients**

35.     The regulation governing Medicare bad debt reimbursement provides that a bad debt must meet the following criteria to be allowable:

(1)     The debt must be related to covered services and derived from deductible and coinsurance amounts.

(2)     The provider must be able to establish that reasonable collection efforts were made.

(3)     The debt was actually uncollectible when claimed as worthless.

11

(4)    Sound business judgment established that there was no likelihood of recovery at any time in the future.

42 C.F.R. § 413.89(e).

36.    CMS has provided sub-regulatory guidance regarding the reimbursement of Medicare bad debts in Part I of the PRM. For instance, PRM § 310 provides guidance concerning the requirement for a reasonable collection effort referenced in subsection (e)(2) of the regulation.

37.    A provider does not have to engage in the reasonable collection effort described in PRM § 310 if the provider determines that the patient is indigent. *See* PRM § 312. Section 312 of the Manual states that providers can deem Medicare beneficiaries to be indigent "when such individuals have also been determined eligible for Medicaid as either categorically needy individuals or medically needy individuals, respectively." PRM § 312.

38.    Uncollectible amounts attributable to the deductibles and coinsurance owed by Dual Eligible Patients that are not otherwise paid by a state Medicaid plan qualify as Medicare bad debts and are to be included as allowable Medicare costs reimbursable to the Medicare provider. *See* PRM § 322.

39.    With regard to unpaid deductibles and coinsurance for services furnished to Dual Eligible Patients, CMS adopted a policy that a provider had to bill a state Medicaid program and receive a remittance advice denying payment before the provider could claim the bad debt on a cost report.  This rule has been referred to as the "must-bill" policy.

40.    The must-bill policy was not, however, applied in all cases to all providers, and historically was not an absolute bar to reimbursement of Medicare bad debts attributable to Dual Eligible beneficiaries.  CMS has made exceptions to the must-bill policy where providers were unable to bill the state Medicaid program because they were not permitted to enroll as Medicaid

providers and obtain a Medicaid provider number.  CMS also permitted the use of alternative documentation to support a provider's reasonable collection effort.  Cost reporting instructions in Part II of the PRM reiterated this longstanding policy. *See* PRM § 1102.3.L (prior to revision by PRM, Chap. 11, Transmittal No. 5).

41.     In the late 1980s, Congress passed a series of statutory provisions that restrict Medicare's ability to disallow a provider's Medicare bad debts based on changes in requirements for Medicare bad debts. Omnibus Budget Reconciliation Act ("OBRA") of 1987, Pub. L. No. 100-203, § 4008(c), 101 Stat. 1330-55, as amended by Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, § 8402, 102 Stat. 3798 and by OBRA 1989, Pub. L. No. 101¬239, § 6023, 103 Stat. 2167, 42 U.S.C. § 1395f note.  These statutory provisions are commonly referred to as the "Bad Debt Moratorium."

42.     Contrary to the Bad Debt Moratorium, CMS reversed its longstanding policy allowing exceptions to the must-bill rule and provided that unpaid Medicare deductibles and coinsurance for Dual Eligible Patients were not reimbursable by Medicare as bad debts until the provider billed the state Medicaid program and the state refused payment with a remittance advice. CMS Joint Signature Memorandum No. 370 (August 3, 2004) ("JSM-370").  In JSM-370, CMS further provided that Intermediaries could no longer accept alternative documentation to remittance advices from a state Medicaid plan, effective for cost reporting periods beginning on or after January 1, 2004.  CMS also revised its cost reporting instructions that referred to use of alternative documentation for bad debts related to Dual Eligible Patients. PRM, Chap. 11, Transmittal No. 5 (Sept. 12, 2003).

43.     CMS has taken the position that state Medicaid plans must reimburse providers for any Medicare cost sharing for Dual Eligible Patients that is due under the payment

13

methodology set forth under the particular state's Medicaid plan.  Since the issuance of JSM-370, CMS has also stated that states must furnish all Medicare providers a process by which they can enroll in the state Medicaid program for purposes of having such claims processed.

## VII. Pennsylvania's Medicaid Program Did Not Permit LTCHs to Enroll Prior to January 1, 2012.

44.     Prior to 2012, the state of Pennsylvania did not permit LTCHs to enroll as providers in the Pennsylvania Medicaid program.  At that time, Pennsylvania did not recognize or reimburse LTCHs, including, but not limited to, the LTCHs owned and operated by Plaintiff in Pennsylvania.  As such, prior to 2012, LTCHs were unable to bill the Pennsylvania Medicaid program for services rendered to Pennsylvania Medicaid beneficiaries.

45.     Prior to 2012, the Pennsylvania Medicaid program also refused to accept and process claims from LTCHs for payment of the Medicare coinsurance or deductibles for services furnished to Dual Eligible beneficiaries.  Pennsylvania Medicaid refused to issue remittance advices ("RAs") for said claims, even when such RAs would demonstrate denial of payment for Medicare coinsurance and deductibles of Dual Eligible beneficiaries.

46.     Despite its policy statements described in Paragraphs 43 and 44 above, CMS did not take, and has not taken, any enforcement action against the Pennsylvania Medicaid program to compel the state to provide a process by which Medicare-participating LTCHs may enroll in the state's Medicaid program, obtain Medicaid billing privileges, or acquire a Medicaid provider number so that such LTCHs may submit claims to Medicaid for unpaid Medicare coinsurance and deductible amounts for Dual Eligible beneficiaries.  CMS has not taken action to ensure that the Pennsylvania Medicaid program processes such claims and provides RAs to LTCHs, even though CMS proclaims that states are obligated to do so.

## VIII.   Medicare Cost Report and Appeals Process

47.     After the close of each fiscal year, a provider submits a cost report to its Intermediary to identify the provider's reasonable costs and the portion of those costs that are allocable to Medicare patients for that fiscal year, also referred to as the cost reporting period. *See In re Medicare Reimbursement Litigation, Baystate Health System v. Thompson*, 309 F. Supp. 2d 89, 92 (D.D.C. 2004); 42 C.F.R. § 413.20(b).   The Intermediary analyzes the cost report and issues an NPR that informs the provider of the Intermediary's final determination of the provider's Medicare reimbursement for the cost reporting period. *Baystate Health System*, 309 F. Supp. 2d at 92; *see also* 42 C.F.R. § 405.1803.

48.     A provider may appeal to the PRRB if the provider is dissatisfied with an Intermediary's determination in an NPR as to the amount of Medicare payment due the provider for a cost reporting period. 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835.

49.     The PRRB is an independent administrative tribunal comprised of five members appointed by the Secretary. 42 U.S.C. § 1395oo(h).   The PRRB must comply with "all provisions of title XVIII of the Act" and the Secretary's "regulations issued thereunder." 42 C.F.R. § 405.1867.

50.     The PRRB is authorized to make substantive decisions concerning Medicare reimbursement issues and to decide questions relating to its jurisdiction. 42 C.F.R. § 405.1873. A decision of the PRRB disposing of an appeal on substantive or jurisdictional grounds constitutes a final administrative decision of the Secretary unless the Secretary reverses, affirms, or modifies the decision within 60 days of the provider's notification of the Board's decision. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. §§ 405.1875, 405.1877.

51.     The Secretary has delegated his authority under the statute to review PRRB decisions to the Administrator of CMS.  A decision of the CMS Administrator to reverse, affirm, or modify the PRRB's decision constitutes the final administrative decision of the Secretary.

52.     A provider may obtain judicial review of a final decision of the PRRB, or a final decision of the CMS Administrator upon review of a PRRB decision, by filing an action within 60 days of the provider's receipt of the decision in the United States District Court for the judicial district in which the provider is located or in the United States District Court for the District of Columbia. 42 U.S.C. § 1395oo(f).

53.     The statute provides that judicial review of a final administrative decision of the Secretary shall be "pursuant to the applicable provisions under" the APA. 42 U.S.C. § 1395oo(f)(1).

54.     The applicable provisions under the APA provide that the reviewing court may set aside agency action that exceeds an agency's statutory authority or that is contrary to law, arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law. 5 U.S.C. § 706.

## IX.     Facts Specific to this Case and Plaintiff's Claims

55.     The providers at issue herein include Medicare-participating LTCHs located in Pennsylvania and Massachusetts, together with one SNF located in Tennessee (collectively, the "Providers").  During the relevant time period, the Providers rendered medically necessary services to patients enrolled in both Medicare and Medicaid, otherwise known as Dual Eligible Patients.

56.     For each of the Medicare bad debt claims at issue, the patient was a Dual Eligible Patients.  Medicare paid its portion of the amount due to the Providers, leaving a copayment or coinsurance due from the beneficiary.  As Medicaid recipients, however, these Dual Eligible

16

Patients were, by definition, indigent.  As a result, these beneficiaries could not afford to pay their Medicare copayment or coinsurance, and the Providers were not required to attempt to collect these amounts from these Dual Eligible Patients.

57.     During the relevant time period, none of the Providers was enrolled in its respective state's Medicaid program.

58.     Seven of the Providers are LTCHs located in Pennsylvania.  Prior to 2012, the Pennsylvania Medicaid program did not permit LTCHs to participate in Medicaid.  When the Pennsylvania LTCHs attempted to enroll, the Pennsylvania Department of Public Welfare returned the Providers' applications, confirming that the Office of Medical Assistance Programs did not have regulatory guidelines for LTCHs and that the Medicaid program, therefore, did not recognize LTCHs as an established provider type or specialty.  For this reason, prior to 2012, although *enrolled* providers were directed to bill Pennsylvania Medicaid using specified forms, no mechanism existed for non-enrolled providers to bill the Medicaid program.

59.     From the time the Pennsylvania LTCHs began participating in the Medicare program, through fiscal year 2011, the Pennsylvania LTCHs were unable to obtain a Medicaid provider number or billing privileges from the Pennsylvania Medicaid program in order to submit claims to Medicaid for the unpaid Medicare coinsurance or deductibles for medically necessary LTCH services that the providers had furnished to their Dual Eligible beneficiaries.  For this reason, the Pennsylvania LTCHs were incapable of having their claims processed or receiving a "remittance advice" from the Medicaid program.

60.     Similarly, neither Massachusetts nor Tennessee offer any mechanism by which a non-participating provider could submit claims for Medicare copayments or coinsurance owed by Medicaid for Dual Eligible beneficiaries.  Thus, because neither Massachusetts LTCHs, nor

the Tennessee SNF, was enrolled in their respective state's Medicaid program, none of these providers could submit claims to Medicaid.  For this reason, the Massachusetts LTCHs and the Tennessee SNF were also incapable of having their claims processed or receiving a "remittance advice" from the Medicaid program.

61.     The Providers' Intermediary, Wisconsin Physician Services, denied the Providers' Medicare bad debt claims for Dual Eligible beneficiaries for fiscal years 2006 through 2014.  (At the time of the 2006 fiscal year adjustments, the fiscal intermediary for the Providers was Mutual of Omaha.  On September 5, 2007, Wisconsin Physician Services was named the Medicare Administrative Contractor for the Providers, with the exception of Kindred Hospital South Philadelphia, which has Novitas Solutions as its fiscal intermediary.)

62.     The Intermediary's denial was based upon its position that in order to claim Medicare bad debts on their cost reports, the Providers were required to bill their respective state Medicaid programs and receive a "remittance advice" denying Medicaid reimbursement pursuant to the must-bill policy.  The Intermediary applied this position even where the providers had not enrolled, and in some cases could not have enrolled, in the Medicaid program and therefore could not bill Medicaid and obtain an RA.   The Intermediary's disallowances totaled approximately $10,104,651.

63.     The Providers appealed the Intermediary's denial to the PRRB.  On November 20, 2017, in a unanimous decision, the PRRB issued a partially-favorable decision, upholding the Intermediary's decision with respect to the Massachusetts LTCHs and the Tennessee SNF and as to the Pennsylvania LTCHs for fiscal years 2012 through 2014, and reversing the Intermediary's decision with respect to Medicare bad debt adjustments of the Pennsylvania LTCHs for fiscal years 2006 through 2011.  As to the latter group, the PRRB reasoned that, because LTCHs could

not enroll in the Pennsylvania Medicaid program prior to 2012, an exception to the must-bill policy should be applied.

64.    The PRRB held that, like the LTCHs in *Cove Associates Joint Venture v. Sebelius*, 848 F.Supp.2d 13, 28 (D.D.C. 2012), the Pennsylvania LTCHs "appear to be caught in a 'Catch-22'" in that they "were told to comply with the Medicare 'must bill' policy even though they were unable to do so because billing privileges for the Pennsylvania Medicaid program was contingent on enrollment in that program and, as LTCHs, they could not enroll in the state Medicaid program."

65.    With respect to the Medicare bad debt claims relating to Massachusetts LTCHs and Tennessee SNF, and relating to the Pennsylvania LTCHs for fiscal years 2012 through 2014, the PRRB concluded that the Intermediary's disallowance was proper.  The PRRB reasoned that because these Providers *could* have enrolled in their state's respective Medicaid programs during the relevant time periods, the obligations of the must-bill policy still applied.  The PRRB came to this conclusion despite the fact that enrollment in a state's Medicaid program is not a prerequisite for rendering services to Dual Eligible beneficiaries in that state and despite the fact that none of the Providers was enrolled with the respective state's Medicaid program during the relevant time periods and therefore could not have billed Medicaid and obtained a RA.

66.    The Secretary has delegated his authority to review PRRB decisions to the Administrator of CMS.

67.    On December 8, 2017, CMS issued a letter to Plaintiff's undersigned counsel notifying Plaintiff that the Administrator of CMS had decided to review the Board's Decision.

68.    On December 21, 2017, the Director for the Chronic Care Policy Group of the Center for Medicare issued a memorandum to the Director of CMS's Office of the Attorney

Advisor stating that the Center for Medicare concurred with the PRRB to the extent its decision upheld the Intermediary's denial.   However, the memorandum stated that the Center for Medicare disagreed with the PRRB's decision to reverse the Intermediary's disallowance with respect to pre-2012 Medicare bad debt claims submitted by the Pennsylvania LTCHs.

69.     The Administrator for CMS reversed the favorable portion of the Board Decision and reinstated the Intermediary's full denial of reimbursement for the Providers' Medicare bad debts based solely upon their alleged failure to bill Medicaid and receive remittance advices to comply with the must-bill policy.   The Administrator stated that, with respect to the Pennsylvania LTCHs prior to 2012, their appropriate course would have been to sue their respective states for their failure to comply with the Secretary's policies:

> If a State does not have the ability to process dual eligible beneficiary claims for all types of Medicare providers, then the State is out of compliance with the Federal statute and the state must be forced to comply.   Where States are made aware of their duty and still refuse to enroll Providers for the purpose of billing and receiving remittance advices, *or otherwise refuse to process non-enrolled providers' claims*, then the appropriate course would be for the Provider to take legal action with their State.

*CMS Administrator Decision* at 23-24.

70.     Although the Administrator demands that the Providers sue their respective state governments to force compliance with federal law, he concedes that "CMS may be in a better position to enforce Federal law," and that CMS itself has the ability to take legal action against states which, *inter alia*, prevent Medicare-certified healthcare providers from enrolling in the state's Medicaid program.   For instance, CMS, upon providing a non-compliant state with reasonable notice and the opportunity for a hearing, "can penalize a State by withholding funds." *Id.* at 24, n. 33.

20

71.     The decision of the Administrator constitutes the Secretary's final determination on the issue in dispute for the Providers' fiscal years in question.

72.     The Administrator's decision was sent by mail to the Plaintiff's counsel under cover of a letter from the CMS Office of the Attorney Advisor dated January 19, 2018.  The Plaintiff's counsel received that letter and the accompanying decision of the Administrator several days later.  Plaintiff timely filed this action within 60 days of the Providers' receipt of the Administrator's decision.

73.     The Administrator's decision is arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by the record, and in excess of the Administrator's authority, within the meaning of the APA, 5 U.S.C. § 706(2), in that the  rigid application of the "must-bill" policy is not necessary, lacks legal authority, violates the Bad Debt Moratorium, and contravenes the statutory prohibition on cost-shifting and the statutory and regulatory requirement that Medicare reimburse providers for expenses actually incurred serving Medicare beneficiaries, among other things.

74.     The Administrator's decision is arbitrary, capricious, an abuse of discretion, not in accordance with the law, and unsupported by the record, in that the Administrator failed to examine the relevant data and articulate any rational connection between the facts found and the decisions made.  The Administrator's decision is not supported by substantial evidence in the record before the PRRB, and improperly relies on evidence not in the record before the PRRB.

75.     The Administrator's decision is arbitrary, capricious, an abuse of discretion, and not in accordance with the law, in that the Administrator gave no weight to the Secretary's abject failure over many years to compel state Medicaid programs to comply with what the Secretary proclaims are statutory obligations to process Medicare providers' claims for unpaid Medicare

21

deductibles and coinsurance for Dual Eligible beneficiaries. *See* Paragraphs 69 and 70, *supra*. Instead, the Administrator irrationally imposes upon individual Medicare providers the obligation to pursue legal action against the state to compel the processing of such claims that the Administrator deems to be a prerequisite for bad debt reimbursement.

76.    The Administrator's decision is arbitrary and capricious in that the Administrator's own agency, CMS, which rigidly applies a requirement that Medicare providers bill state Medicaid programs and obtain remittance advices for unpaid Medicare deductibles and coinsurance, has failed to make any serious effort to enforce the requirement that state Medicaid agencies accept and process such claims.

77.    The Administrator's decision violates the Due Process Clause of the Fifth Amendment to the United States Constitution by denying the Providers Medicare payments provided under statute and regulation based on alleged requirements that are legally impossible to fulfill and/or with which Providers have had no opportunity to comply

## X.    <u>Requested Relief</u>

78.    Plaintiff requests judgment in its favor with an order providing the following relief:

(a)    declaring that the Secretary's Decision is contrary to law, arbitrary and capricious, an abuse of discretion, and unsupported by substantial evidence;

(b)    reversing and vacating the Secretary's Decision and remanding Plaintiff's appeal with directions that the favorable portion of the Board Decision, pertaining the Pennsylvania LTCHs' pre-2012 Medicare bad debt claims, be reinstated and affirmed, and that the unfavorable portion of the Board Decision, pertaining to the Tennessee SNF, the Massachusetts LTCHs, and the Pennsylvania LTCHs' post-2012 Medicare bad debt claims, be reversed;

(c)     requiring the Secretary promptly to reimburse Plaintiff's Providers for their Medicare bad debts attributable to Dual Eligible Patients, plus interest calculated in accordance with 42 U.S.C. § 1395oo(f)(2);

(d)     legal fees and costs of suit incurred by Plaintiff; and

(e)     such other relief as the Court may consider appropriate.

Dated:  March 21, 2018

Respectfully submitted,

By: /s/ Bradford J. Kelley
Bradford J. Kelley (D.C. Bar No. 1025941)
Email: bradford.kelley@agg.com
Samuel M. Shapiro (Ga. Bar No. 717286)
(*pro hac vice* to be submitted)
Email: samuel.shapiro@agg.com

ARNALL GOLDEN GREGORY LLP
1775 Pennsylvania Ave., NW
Suite 1000
Washington, DC  20006
Telephone: 202.677.4920

Glenn P. Hendrix (Ga. Bar No. 346590)
(*pro hac vice* to be submitted)
Email: glenn.hendrix@agg.com
W. Jerad Rissler (Ga. Bar No. 142024)
(*pro hac vice* to be submitted)
Email: jerad.rissler@agg.com

ARNALL GOLDEN GREGORY LLP
171 17th Street, NW, Suite 2100
Atlanta, GA 30363
Telephone: 404.873.8500

*Counsel for Plaintiff*

11938051