## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **KINDRED HEALTHCARE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Case No. 18-650 (RJL)** |
| | ) | |
| **ALEX M. AZAR, II** | ) | |
| *Secretary, United States Department* | ) | |
| *of Health and Human Services,* | ) | |
| | ) | |
| **Defendant.** | ) | |

**FILED**

**JUL - 1 2020**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

### MEMORANDUM OPINION

June 28, 2020

Kindred Healthcare, Inc. ("Kindred") brings various Administrative Procedure Act ("APA") and constitutional claims against the Secretary of Health and Human Services, challenging the Secretary's decision to deny several of Kindred's long-term care hospitals ("LTCHs") and a Skilled Nursing Facility ("SNF") Medicare reimbursements for services provided to Medicare beneficiaries from 2006 to 2014. During the relevant period, Kindred's LTCHs and its SNF (collectively, "the Providers") all participated in Medicare, but none participated in their respective states' Medicaid programs. When certain beneficiaries eligible for both Medicare and Medicaid failed to pay deductibles and coinsurance payments owed the Providers, the Providers sought reimbursement under Medicare. The Secretary ultimately denied their requests, concluding the Providers failed to satisfy the regulatory criteria for reimbursement of payments owed by the beneficiaries.

Kindred filed suit.   Pending before me are the parties' cross-motions for summary judgment, as well as Kindred's motion to strike evidentiary exhibits attached to the Secretary's motion.   *See* Kindred Mot. for Summ. J. ("Kindred Mot.") [Dkt. # 13]; Def.'s Cross Mot. for Summ. J. ("Def.'s Mot.") [Dkt. # 21]; Kindred Mot. to Strike ("Mot. to Strike") [Dkt. # 25].   Kindred subsequently moved for oral argument or, alternatively, for leave to file a surreply [Dkt. # 34].   Upon consideration of the briefing, the relevant law, the entire record, and for the reasons stated below, Kindred's motion to strike is **GRANTED**, Kindred's motion for summary judgment is **GRANTED**, the Secretary's cross-motion for summary judgment is **DENIED**, and Kindred's motion for oral argument is **DENIED AS MOOT**.

## BACKGROUND

**I.   Legal Background**

    a.   *The Medicare Program*

The Medicare program "is a federally funded medical insurance program for the elderly and disabled."   *Fischer v. United States*, 529 U.S. 667, 671 (2000).   On behalf of the Secretary of Health and Human Services ("the Secretary"), Centers for Medicare and Medicaid Services ("CMS") administers the Medicare program "through contracts with [M]edicare administrative contractors," known as fiscal intermediaries ("the intermediaries").   42 U.S.C. § 1395h.   To receive reimbursement for services provided to Medicare patients under the program, a provider must submit annual cost reports to its

intermediary, which in turn determines the amount of reimbursement due that provider. 42 C.F.R. § 413.20(b), 413.24(f).

If a provider is "dissatisfied with a final determination" of the intermediary, it may appeal to the Provider Reimbursement Review Board ("the Board"). 42 U.S.C. § 1395oo(a). The Board's decision is "final unless the Secretary"—often through the CMS Administrator—"reverses, affirms, or modifies the Board's decision." *Id.* § 1395oo(f)(1); 42 C.F.R. § 405.1875 (recognizing that the Secretary has delegated to the Administrator his authority to review the Board's decisions). A provider may "obtain judicial review of any final decision" by the Board or the CMS Administrator ("the Administrator"). 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1877(a)(2).

b. *The Medicaid Program*

"The Medicaid program is a cooperative federal-state program to provide medical care for eligible low-income individuals . . . jointly funded by federal and state governments." *Grossmont Hosp. Corp. v. Burwell*, 797 F.3d 1079, 1081 (D.C. Cir. 2015). For a state to qualify for federal funding, the Secretary must approve the state's Medicaid plan, which lists covered medical services. *See* 42 U.S.C. §§ 1396a, 1396b. Some beneficiaries are eligible for both Medicare and Medicaid. Those individuals, who are often elderly and low-income, are known as "dual eligibles." *See Grossmont Hosp.*, 797 F.3d at 1081. "Medicare is the primary payor" in those circumstances, but "[s]tate Medicaid plans often mandate that the state Medicaid agency pay for part[,] or all[,] of the Medicare deductibles and coinsurance amounts incurred in connection with treating these dual eligibles." *Id.*

3

c.  *Medicare Bad Debts*

Although the federal government bears most of the costs of Medicare, "individual Medicare patients are 'often responsible for both deductible and coinsurance payments for hospital care.'"  *Mercy Gen. Hosp. v. Azar*, 344 F. Supp. 3d 321, 326–27 (D.D.C. 2018) (quoting *Cmty. Health Sys., Inc. v. Burwell*, 113 F. Supp. 3d 197, 203–04 (D.D.C. 2015)). If a Medicare patient fails to make those payments to a provider, the provider may seek reimbursement from CMS for those amounts, known as "bad debts." *See* 42 C.F.R. § 413.89(e); *see also* 42 C.F.R. § 413.89(b)(1) (defining "bad debts" as "amounts considered to be uncollectible from accounts and notes receivable that were created or acquired in providing services."). To obtain bad debt reimbursement, providers must demonstrate that the debt satisfies four long-standing criteria, in effect since 1966:

> (1) The debt must be related to covered services and derived from deductible and coinsurance amounts.
>
> (2) The provider must be able to establish that reasonable collection efforts were made.
>
> (3) The debt was actually uncollectible when claimed as worthless.
>
> (4) Sound business judgment established that there was no likelihood of recovery at any time in the future.

42 C.F.R. § 413.89(e); *see also* 31 Fed. Reg. 14808, 14813 (Nov. 22, 1966).

CMS's Provider Reimbursement Manual, Part I ("PRM") provides guidance as to what constitutes a "reasonable collection effort." Section 310 provides that "reasonable collection efforts . . . must involve the issuance of a bill on or shortly after discharge or death of the beneficiary to the party responsible for the patient's personal financial

4

obligations." PRM § 310; *see also* Admin. Record ("AR") at 12. Section 312, however, provides an exception to PRM § 310 for bad debts incurred by indigent patients: "Once indigence is determined and the provider concludes that there ha[s] been no improvement in the beneficiary's financial condition, the debt may be deemed uncollectible *without applying the § 310 procedures*." PRM § 312 (emphasis added). It further explains that individuals who are eligible for Medicaid "may be automatically deemed indigent," though the provider must still "determine that no source other than the patient would be legally responsible for the patient's medical bill." PRM § 312.

Finally, § 322 provides further guidance with respect to bad debts incurred by dual eligibles specifically. It explains that "[w]here the State is obligated either by statute or under the terms of its [Medicaid] plan to pay all, or any part, of the Medicare deductible or coinsurance amounts, those amounts are not allowable as bad debts under Medicare." PRM § 322. Nonetheless, "[a]ny portion of such deductible or coinsurance amounts that the State is *not* obligated to pay can be included as a bad debt under Medicare, provided that the requirements of §[ ]312 or, if applicable, §[ ]310 are met." *Id.* (emphasis added). Additionally, if "the State has an obligation to pay, but either does not pay anything or pays only part of the deductible or coinsurance," a provider is entitled to "any portion of the deductible or coinsurance that the State does not pay that remains unpaid by the patient, . . . as a bad debt under Medicare, provided that the requirements of § 312 are met." *Id.*

Apart from those PRM provisions, CMS also imposes two other requirements on providers, which it adopted through adjudication: (1) the provider must bill the relevant

state Medicaid program ("the Billing Requirement") and (2) the provider must receive a remittance advice ("RA") from the state denying payment ("the RA Requirement"). AR at 20; *see also* Compl. ¶ 39; Ans. ¶ 39. The Secretary refers to these two requirements together as the "must-bill" policy. AR at 2; Ans. ¶ 39.

d. *Bad Debt Moratorium*

In 1987, after the Inspector General of HHS proposed eliminating bad debt reimbursement to Medicare providers entirely, Congress passed legislation aimed at insulating providers from any changes to the reimbursement requirements. *Mercy Gen. Hosp. v. Azar*, 344 F. Supp. 3d 321, 329 (D.D.C. 2018); *see also Hennepin Cty. Med. Ctr. v. Shalala*, 81 F.3d 743, 750–51 (8th Cir. 1996) ("In passing the moratorium, Congress was motivated to prevent unexpected consequences to providers from the [I]nspector [G]eneral's proposed changes in the criteria for bad debt reimbursement."). That legislation, now referred to as the "Bad Debt Moratorium," froze in place the Secretary's Medicare bad debt reimbursement requirements as of August 1, 1987. Specifically, it provided that

> the Secretary of Health and Human Services shall not make any change in the policy in effect on August 1, 1987, with respect to payment under [the Medicare program] to providers of service for reasonable costs relating to unrecovered costs associated with unpaid deductible and coinsurance amounts incurred under [the Medicare program] (including criteria for what constitutes a reasonable collection effort).

Omnibus Budget Reconciliation Act of 1987 ("OBRA"), Pub. L. No. 100–203, tit. IV, § 4008(c), 101 Stat. 1330–55 (codified at 42 U.S.C. § 1395f note). In 1988, Congress amended the Medicare Act to clarify that its Moratorium meant that *no* policy changes

could be made to the "criteria for what constitutes a reasonable collection effort . . . *includ[ing]* criteria for indigency determination procedures, for record keeping, and for determining whether to refer a claim to an external collection agency." Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100–647, tit. VIII, § 8402, 102 Stat. 3342, 3798 (codified at 42 U.S.C. § 1395f note) (emphasis added).

## II.   Procedural Background

Kindred is a Kentucky-based corporation that owns and operates seven LTCHs in Pennsylvania (the "Pennsylvania LTCHs"), two LTCHs located in Massachusetts (the "Massachusetts LTCHs"), and one SNF located in Tennessee (the "Tennessee SNF"). AR at 1233–34. During the time period at issue, the Providers were enrolled in Medicare but not in their respective states' Medicaid programs. *Id.* at 1234–35. Indeed, for much of the cost reporting periods at issue here, Pennsylvania did not permit LTCHs to enroll as providers in its Medicaid program. *Id.* at 1235; *see also id.* at 58 (Board Decision); *id.* at 105 (6/18/2009 PA Dep't of Public Welfare Ltr. returning enrollment request).

Because the Providers were not enrolled in Medicaid, they were unable to obtain RAs from their states' Medicaid programs, despite submitting invoices for services rendered to dual eligibles. Kindred Mot. at 14–15; *see* AR 1234 (stipulating that the Providers submitted to the Board or Intermediary "copies of the documentation of billing ('invoices') sent to the Pennsylvania, Massachusetts[,] and Tennessee Medicaid agencies ('State Medicaid Programs')" for fiscal years 2006 through 2013). Providers sought $9,700,000 in reimbursement for services provided dual eligibles during fiscal years 2006 to 2014. AR at 1234. The Providers' CMS Intermediary denied reimbursement for their

bad debt claims for the entire period, concluding the Providers had not complied with CMS's "must-bill" policy. AR at 1235.

The Providers then appealed to the Provider Reimbursement Review Board ("Board"). On November 20, 2017, the Board reversed the Intermediary's denial as to the Pennsylvania LTCHs for reporting periods before January 2012. AR at 52. It reasoned that because Pennsylvania did not permit LTCHs to enroll in its Medicaid program prior to January 1, 2012, and the Pennsylvania LTCHs could not obtain the required RAs, an exception to the must-bill policy was warranted. *Id.* at 58. In the Board's view, the Pennsylvania LTCHs were "caught in a 'Catch-22'" because they "were told to comply with the Medicare 'must-bill' policy even though they were unable to do so because billing privileges for the Pennsylvania Medicaid program was contingent on enrollment in that program and, as LTCHs, they could not enroll in the state Medicaid program." *Id.* The Board otherwise affirmed the Intermediary's reimbursement denials as to the Massachusetts LTCHs, the Tennessee SNF, and the Pennsylvania LTCHs *after* January 2012, when Pennsylvania began permitting LTCHs to enroll in Medicaid. *Id.*

On January 17, 2018, the Administrator reversed the Board's decision in part and reinstated the intermediary's full denial of reimbursement based on the Providers' failure to obtain state-issued RAs. *Id.* at 2–29. The Administrator concluded that "Medicare requires a provider to bill the State *and* receive a remittance advice," relying on several PRM provisions, including: Section 310, which requires a provider to issue a bill; Section 312, which requires that the provider determine a state Medicaid program is not responsible for payment; and Section 322, which, in the Administrator's view, "plainly requires that

the provider bill the State as a prerequisite of payment of the claim by Medicare as a bad debt." *Id.* at 20–22 (emphasis added). The Administrator asserted that the RA requirement had been consistently reflected in "Administrator decisions and CMS policy pronouncements," pointing specifically to the 2004 Joint Signature Memorandum 370 ("JSM-370"), which references both the Billing Requirement and the RA Requirement. *Id.* at 20–21.

The Administrator ultimately concluded the RA Requirement applied to Providers and, "[b]ecause the State has not issued remittance advices for these services contemporaneous with the cost reporting periods," the Providers did not demonstrate that they had engaged in "reasonable collection efforts." *Id.* at 27. With respect to the Massachusetts, Tennessee, and post-2012 Pennsylvania claims, the Administrator noted that Providers' failure to obtain RAs was due to a "business decision not to enroll in the respective State's Medicaid program." *Id.* at 24. And with respect to the pre-2012 Pennsylvania claims, she determined the Providers remained responsible for obtaining RAs, even if the state did not permit enrollment with Medicaid. *Id.* In her view, if a state was not processing dual eligible claims, the Providers could have sued the state for noncompliance with federal law. *Id.* at 24–25. The Administrator further concluded the Bad Debt Moratorium did not apply to Providers' claims because the "existing billing policy" was in effect in 1987. *Id.* at 28.

On March 21, 2018, Kindred filed suit in this Court, and on October 2, 2018, it moved for summary judgment. After numerous extensions of time, the Secretary filed his opposition to Kindred's motion and cross-moved for summary judgment on July 9, 2019.

On August 21, 2019, Kindred moved to strike several exhibits on which the Secretary relied, arguing that the Court should not consider them because they were not part of the administrative record.  The parties completed briefing on Kindred's motion to strike on September 11, 2019 and on their cross-motions for summary judgment on November 21, 2019.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56, summary judgment may be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c).  In cases involving claims under the APA, *see* 42 U.S.C. § 1395oo(f)(1), "the district judge sits as an appellate tribunal" and the "'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  Judicial review is limited to the administrative record, since "[i]t is black-letter administrative law that in an [APA] case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision." *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (internal quotation marks omitted); *see also* 5 U.S.C. § 706 ("[T]he Court shall review the whole record or those parts of it cited by a party . . . .").

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  "The scope of review under the 'arbitrary and capricious' standard is narrow," however, "and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463

U.S. 29, 43 (1983). Nevertheless, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

An agency's factual findings must be "supported by substantial evidence on the record as a whole." *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992). "The 'substantial evidence' standard requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *Fla. Gas Transmission Co. v. Fed. Energy Regulatory Comm'n*, 604 F.3d 636, 645 (D.C. Cir. 2010) (quoting *FPL Energy Me. Hydro LLC v. Fed. Energy Regulatory Comm'n*, 287 F.3d 1151, 1160 (D.C. Cir. 2002)). The standard is "highly deferential" and "requir[es] only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rossello ex rel. Rossello v. Astrue*, 529 F.3d 1181, 1185 (D.C. Cir. 2008) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).

## ANALYSIS

### I.    Kindred's Motion to Strike

Kindred moves to strike certain exhibits attached to the Secretary's cross-motion for summary judgment but not included in the administrative record. *See* Kindred Mot. to Strike at 2. Those exhibits are: (1) a July 8, 2019 declaration from a CMS employee and corresponding 2018-2019 emails exchanges with the Massachusetts Medicaid agency; (2) a July 3, 2019 declaration from a CMS employee and corresponding 2019 emails with the Tennessee Medicaid agency; (3) November 2017 emails between the Secretary's counsel

and Pennsylvania's Medicaid agency; and (4) a December 1985 Medicare Intermediary Manual. *See* Def.'s Mot. at Exs. C, D, E, & F; Def.'s Errata Re: Exhibit F [Dkt. # 27].

Kindred's motion is granted. It is black-letter law that judicial review of agency action is limited to the administrative record before the agency at the time it made its decision. *See Camps v. Pitts*, 411 U.S. 138, 142 (1973); *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014); *see also Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984) ("Review [of the Secretary's decision] is to be based on the [ ] administrative record that was before the Secretary at the time he made his decision."). None of the exhibits were introduced as evidence in the administrative proceedings below, and they are not part of the administrative record. Indeed, nearly all of the information contained in the exhibits was collected after Kindred filed its complaint, and much of it was collected after Kindred filed its motion for summary judgment.[1]

Although the Secretary acknowledges that extra-record evidence is generally prohibited in APA cases, he argues that an exception to that general rule applies. Def.'s Opp. to Mot. to Strike at 4 [Dkt. # 28]. Unfortunately, the Secretary's position is without merit. Although it is true that courts can accept "a more detailed explanation that does not present a new basis for the agency's action," *Grossmont Hosp. Corp. v. Sebelius*, 903 F. Supp. 2d 39, 58 n.10 (D.D.C. 2012), the Secretary's exhibits do not qualify under that

---

[1] Two of the Secretary's declarations and corresponding emails post-date Kindred's filing of its complaint in this Court on March 21, 2018. *See* Def.'s Mot. at Exs. C & D. The third string of emails was created in November 2017, shortly before the Board issued its initial decision. *See id.* at Ex. E. The Secretary does not assert that information was considered by the Administrator in her subsequent reversal of the Board's determination. *See generally* Def.'s Opp. to Mot. to Strike [Dkt. # 28].

exception.  Those exhibits do not "merely illuminate[]reasons obscured but implicit in the administrative record." *Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996) (quoting *Seafarers Int'l Union of N. Am. v. United States*, 891 F. Supp. 641, 647 (D.D.C. 1995)). Rather, they contain wholly new information not presented during the administrative process and are "offered to 'bolster the weight' of the evidence cited by the Administrator as support for his position." *See Mercy Gen. Hosp. v. Azar*, 344 F. Supp. 3d 321, 349 (D.D.C. 2018) (quoting *Dist. Hosp. Partners, L.P. v. Sebelius*, 932 F. Supp. 2d 194, 203 (D.D.C. 2013)) (striking Secretary's attempt to rely on 1985 Manual at issue here). Accordingly, I will not consider them.

## II.    Cross-Motions for Summary Judgment

Both parties have moved for summary judgment.  Kindred contends the Secretary's decision denying reimbursement is arbitrary, capricious, or contrary to law for five reasons: (1) the decision is inconsistent with CMS's past application of the must-bill policy, which permitted exceptions; (2) the decision failed to adequately address the Providers' inability to obtain state-issued RAs; (3) the Administrator relied on prior agency decisions where the providers did participate in Medicaid, all of which are inapplicable here; (4) CMS did not apply the RA requirement to the Providers before 2006; and (5) CMS's imposition of an RA requirement is a change in policy that violates the 1987 Bad Debt Moratorium. *See* Kindred Mot. at 21–37.  The Secretary counters that Providers were properly denied Medicare reimbursement because they failed to obtain the requisite RAs from the state Medicaid programs. *See* Def.'s Mot. at 1–2.  According to the Secretary, its "must-bill" policy is longstanding and has been applied to all providers consistently, with no

exceptions, since before the 1987 Bad Debt Moratorium. *Id.* at 14, 20–21. Unfortunately for the Secretary, I disagree.

As noted above, the Bad Debt Moratorium prohibits the Secretary from "mak[ing] any change in the policy in effect on August 1, 1987, with respect to" bad debt reimbursement to Medicare providers, "including criteria for what constitutes a reasonable collection effort." OBRA, Pub. L. No. 100–203, tit. IV, § 4008(c), 101 Stat. 1330–55. Whether the Secretary's current must-bill policy was "in effect" on August 1, 1987 is a factual question, and the Court must review it under the substantial evidence standard. *Mercy General*, 344 F. Supp. 3d at 337 (collecting cases). To satisfy that standard, the Secretary must do more than identify pre-Moratorium materials that are merely consistent with the current must-bill policy, which includes the RA Requirement. *Id.* at 342–43. Rather, he must establish that before the 1987 Moratorium was passed, CMS, in fact, applied the must-bill policy as it does now. *Id.*[2] The Secretary has failed to do so. Indeed, *nothing* in the record demonstrates that CMS's must-bill policy required providers to obtain a state-issued RA before 2004, let alone when the Bad Debt Moratorium was passed in 1987.

---

[2] The Secretary appears to misunderstand the relevant standard. He cites to several cases holding the RA Requirement is a reasonable interpretation of CMS's bad-debt regulations, including our Circuit Court's decision in *Grossmont Hosp. Corp. v. Burwell*, 797 F.3d 1079 (D.C. Cir. 2015). Def.'s Mot. at 2; Def.'s Reply at 3; *see also* Def.'s Mot. at 18 (referring to must-bill policy as "a reasonable exercise of the Secretary's authority"). But those cases are inapposite. As noted above, the question is whether the RA Requirement was applied in 1987, not whether the RA Requirement is a reasonable interpretation of CMS's regulations. *Mercy General*, 344 F. Supp. 3d at 343.

The Secretary argues that the must-bill policy, including the RA Requirement, predated the Bad Debt Moratorium, but none of the materials he cites support that contention.  The Secretary first points to provisions in PRM that predate the Bad Debt Moratorium, noting § 310 "requires collection efforts to involve the issuance of a bill" and § 322 clearly imposes the must-bill policy on dual-eligibles. Def.'s Mot. at 21.  But those provisions make no mention of an RA Requirement. *See* PRM §§ 310, 322; *see also Select Specialty Hospital-Denver v. Azar*, 391 F. Supp. 3d 53, 59–60 (D.D.C. 2019) (reaching the same conclusion).  Nor is there any reason to conclude that those provisions, read together, create an RA requirement. *See Mercy General*, 344 F. Supp. 3d at 340–42.

The Secretary next turns to three pre-1987 decisions that, in his view, demonstrate the "must-bill" policy is "not new." Def.'s Mot. at 21–22; AR at 57 n.37.  Unfortunately, those decisions suffer from the same flaw as the cited PRM provisions:  they make no reference to an RA Requirement. *Id.*  At most, they articulate and affirm a Billing Requirement. *See also Select Specialty*, 391 F. Supp. 3d at 58–59 (acknowledging that although the requirement that the Billing Requirement "has been consistently articulated in the final decisions of the Secretary[,] . . . CMS did not impose an absolute requirement that the Providers obtain a Medicaid remittance advice (RA) until 2004" (citations omitted)).[3]

---

[3] In his decision below, the Secretary also pointed to post-1987 decisions. AR at 20–21 & n.19. Even assuming those decisions recognized an RA Requirement, they were issued long after the Bad Debt Moratorium was passed in 1987.

The Secretary also relies on CMS's August 2004 JSM-370, arguing the guidance "ma[de] abundantly clear that *any* provider seeking to claim coinsurance and deductibles for dual eligibles as Medicare bad debt must first bill the state Medicaid program and receive remittance advice to that effect." Def.'s Mot. at 22.  The Secretary's reliance is misplaced for two reasons.  First, JSM-370 was issued in 2004, long after the Bad Debt Moratorium went into effect in 1987.  It plainly does not establish that CMS imposed the RA Requirement at that time.  Second, JSM-370 was only issued to CMS intermediaries, not Medicare providers or the public at large.  As such, it is "not an appropriate vehicle to set policy," and it certainly did not put Providers on notice that the must-bill policy included a strict RA Requirement.  *Select Specialty*, 391 F. Supp. 3d at 59 (citations omitted).

The Secretary counters that the regulatory history behind JSM-370 confirms that CMS consistently applied the must-bill policy, including the RA Requirement, "at all times relevant to this case."  Def.'s Mot. at 23.  He asserts, without citation, that when the Bad Debt Moratorium was passed in 1987, "CMS required that the provider bill the state Medicaid program and receive a remittance advice to justify a Medicare bad-debt claim." *Id.*  According to the Secretary, CMS revised its guidance in 1995 to allow Medicare providers to submit documentation other than an RA to justify a bad debt claim.  Def.'s Mot. at 10; AR at 21.  In other words, the 1995 revisions expanded the types of acceptable documentation for bad debt reimbursement.  *See id.*  After the Ninth Circuit concluded those revisions were inconsistent with the "must-bill" policy and therefore not enforceable, CMS changed the PRM guidance to "revert back to pre-1995 language, which require[d] providers to bill the individual States . . . before claiming Medicare bad debts."  *Id.*  In the

Secretary's view, JSM-370 thus only reaffirmed CMS's longstanding, pre-1995 policy, which required all providers seeking bad debt reimbursement to "first bill the state Medicaid program and receive a remittance advice to that effect." Def.'s Mot. at 22.

The Secretary again improperly conflates the Billing Requirement and the RA Requirement.  According to the CMS Administrator, the pre-1995 language "require[d] providers to *bill* the individual States for dual-eligible co-pays and deductibles before claiming Medicare bad debts." AR at 21 (emphasis added).  But it makes no mention of an RA Requirement.  Nor do the 1995 revisions, which simply provide other options for documenting bad debts "in lieu of *billing* the states."  AR at 1207 (emphasis added).[4] Accordingly, neither JSM-370 nor its regulatory history support the Secretary's contention that the RA Requirement was in effect when the Bad Debt Moratorium was passed.

Because I conclude the RA Requirement violates the Bad Debt Moratorium, I do not reach Kindred's remaining arguments.  The Secretary contends, however, that I must nevertheless affirm the Administrator's decision because the Providers did not comply with the Billing Requirement of the must-bill policy.  *See* Def.'s Reply at 4.  I decline to do so. As Providers point out, the Administrator's decision did not rest on Providers supposed non-compliance with the Billing Requirement.  *See* AR at 23 ("The Provider[s] claimed

---

[4] As noted above, the Court strikes the extra-record exhibits attached to the Secretary's cross-motion, including the CMS Medicare Intermediary Manual published in December 1985.  But even if the court were to consider the Manual, that evidence does not advance the Secretary's position.  The 1985 Manual instructs Medicare intermediaries as follows: "If the State has been billed, but did not pay the amount due, determine if there is a written notice of rejection in the patient's file.  Review the rejection notice and if it is found to be acceptable, allow the bad debt for Medicare purposes." *See* Def.'s Mot. at 21.  That language does not establish an RA Requirement. It merely "supports the proposition that the must-bill policy existed in some form before 1987." *Select Specialty Hosp.-Denver, Inc. v. Azar*, 391 F. Supp. 3d 53, 58 n.3 (D.D.C. 2019).

bad debts for dual eligible crossover claims and the [Intermediary] disallowed such claims *for failure to submit a State issued RA*.") (emphasis added); *see also id.* at 27 ("*Because the State has not issued remittance advices* for these services contemporaneous with the cost reporting periods, the bad debts cannot be demonstrated as 'actually uncollectible when claimed as worthless' . . . .") (emphasis added).   Nor did the Secretary submit evidence in the administrative record below suggesting Providers failed to bill the relevant state Medicaid programs.   To the contrary, the record before the Board, which the Administrator did not challenge or refute, reflects that Providers *did* bill the relevant state Medicaid agencies.   *See id.* at 1234.[5]   And, moreover, the Secretary previously acknowledged in this suit that Providers "submitted evidence of apparent billing of states in an effort to obtain RAs." Def.'s Mot. at 18.

## CONCLUSION

For all of the foregoing reasons, Kindred's motion to strike is **GRANTED**, Kindred's motion for summary judgment is **GRANTED**, the Secretary's cross-motion for summary judgment is **DENIED**, and Kindred's motion for oral argument is **DENIED AS MOOT**.   This case is remanded to the Secretary, who is directed to reconsider whether,

---

[5] The Secretary argues that neither he, nor CMS, are bound by the stipulation submitted by Kindred and the CMS Intermediary to the Board because they did not participate in that hearing and therefore did not have an opportunity to challenge the stipulation's content.   *See* Gov't Opp'n to Mot. to Strike at 2 (*citing Howard Young Med. Ctr., Inc. v. Shalala*, 207 F.3d 437, 443 (7th Cir. 2000).   But the Administrator failed to introduce any additional evidence during her review of the Board's decision, and the Secretary cannot now contest, without citation to the administrative record, those facts.

absent the RA Requirement, the Providers are entitled to bad debt reimbursement.   A

separate order consistent with this decision accompanies this Memorandum Opinion.


RICHARD J. LEON
United States District Judge